# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 06-1553


**STATE OF LOUISIANA**

**VERSUS**

**HUEY LEE RICHARDS**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 277102
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and J. David Painter, Judges.

**AFFIRMED.**

**James Edward Beal**
**Louisiana Appellate Project**
**P. O. Box 307**
**Jonesboro, LA 71251-0307**
**(318) 259-2391**
**Counsel for Defendant-Appellant**
**Huey Lee Richards**

**James C. Downs**
**District Attorney – 9th JDC**
**Loren M. Lampert**
**Assistant District Attorney – 9th JDC**
**P. O. Drawer 1472**
**Alexandria, LA 71309**
**(318) 473-6650**
 **Counsel for State-Appellee:**
 **State of Louisiana**

**Pickett, Judge.**

## TRIAL COURT PROCEEDINGS

A month after the February 24, 2005 murder of La'Kedric Quinney, the Rapides Parish Grand Jury indicted the defendant, Huey Lee Richards, with committing the first degree murder of Mr. Quinney. At his arraignment, the defendant pled not guilty. On May 22, 2006, the prosecution amended the indictment and reduced the charge to second degree murder, in violation of La.R.S. 14:30.1. The defendant also pled not guilty to the reduced charge.

After *voir dire*, trial on the merits began May 24, 2006. The trial concluded the next day, and the jury found the defendant guilty of second degree murder. After his conviction, the defendant filed a motion for new trial. After denying the defendant's motion for new trial on June 19, 2006, the district court sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.

The defendant now appeals alleging that the state failed to present evidence sufficient to support his conviction.

EVIDENCE PRESENTED

The first witness called by the State in this matter was Appifanny Randall. Ms. Randall is the seventeen-year-old mother of the victim's child. Although Mr. Quinney had been living with his mother in Baton Rouge, he had moved in with Ms. Randall about a week before he disappeared. On the evening of February 23, 2005, Mr. Quinney and Ms. Randall had been riding around in a white Cadillac Mr. Quinney had borrowed from Defendant. After making several stops, Mr. Quinney and Ms. Randall returned their sleeping infant home.

1

Mr. Quinney and Ms. Randall left again and went to the store. Ms. Randall stayed in the car while Mr. Quinney went inside. When he returned to the car at about 2:00 a.m., he had a signed check. The defendant had given Mr. Quinney the check in repayment for some crack cocaine Mr. Quinney had sold to the defendant. When Ms. Randall's mother refused to cash the check, Mr. Quinney, saying it was too late, returned the check to the defendant inside the store. Before returning to the store, Mr. Quinney expressed to Ms. Randall his anger at the defendant and his reluctance to re-enter the store, explaining that the reluctance was because the defendant was naked. In exchange for the check, the defendant gave him a credit card bearing a woman's name. Mr. Quinney then unsuccessfully tried to use the credit card to withdraw cash at Red River Bank. Ms. Randall thought that the card had been stolen and told Mr. Quinney her suspicion.

Ms. Randall and Mr. Quinney returned to the store. When they arrived, a woman was standing outside of the store. The defendant and the woman were the only people at the store. The woman stopped Mr. Quinney and spoke to him as he approached the store. Ms. Randall believed that the woman was asking Mr. Quinney for crack. Ms. Randall did not think that Mr. Quinney gave her anything before he entered the store because the woman yelled, "I got $2 -- I got $2." After awhile, the woman followed Mr. Quinney into the store, and Mr. Quinney exited. When Mr. Quinney got into the car, he told Ms. Randall that the defendant had told him to go to Hibernia instead of the Red River Bank.

Ms. Randall and Mr. Quinney went to Hibernia, and Ms. Randall got out of the car because Mr. Quinney had been taking too long. Mr. Quinney told her that the card had gotten stuck in the ATM and that only happened when the card was stolen.

After leaving Hibernia, Mr. Quinney dropped Ms. Randall off at home. Ms. Randall told Mr. Quinney that he should not return to the store. Ms. Randall asked Mr. Quinney to remain at home, but he said that he would be back in five minutes and left. When she awoke around 5:00 a.m., Ms. Randall noticed that Mr. Quinney was not home and called Bernice Quinney, Mr. Quinney's mother. Ms. Randall did not see Mr. Quinney again.

When Ms. Randall returned to the store looking for Mr. Quinney, she saw the defendant's car parked outside and encountered the defendant's wife when she entered the building. Speaking rapidly and shaking her head, the defendant's wife denied having seen the defendant or Mr. Quinney and said that the defendant was at the casino. The defendant's wife told Ms. Randall that she did not know how she had gotten the white Cadillac back from Mr. Quinney or the defendant. The defendant's wife followed Ms. Randall out of the store, then locked up, and left in the car. Ms. Randall and her family continued to search for Mr. Quinney over the next ten days. They also posted missing person flyers that Ms. Quinney and Ms. Randall's aunt had made.

Later, Ms. Randall returned to the store with Ms. Quinney and they encountered the defendant while he was being questioned by the police. Ms. Randall saw that the defendant's face was scratched. The defendant told them that Mr. Quinney had slid the car keys under the store's door and had left with some men with ecstasy pills. Ms. Randall attempted to tell the police that it would be impossible to slide car keys under the store's door. Ms. Randall and Ms. Quinney exited the store when the police told them to leave, but Ms. Randall and some of her family went back later.

3

In all the time Ms. Randall had known Mr. Quinney, she never saw him with a gun. Mr. Quinney had carried a small pocketknife for a while, but he had lost it about seven months before he disappeared. Other than the pocketknife, Ms. Randall had never seen Mr. Quinney carry a knife. Instead, Mr. Quinney seemed confident that he could defend himself without weapons. Ms. Randall described Mr. Quinney as standing about an inch under six feet and weighing 150 pounds.

The second witness to testify for the prosecution was Gwendolyn Davenport. Ms. Davenport is addicted to crack cocaine. That night, Ms. Davenport only had $3.00, so she could not get high. Instead, she went to the store to buy snacks. As she approached the store, Ms. Davenport noticed that the lights were on, but no vehicle was parked outside. As Ms. Davenport turned to go home, she saw the defendant's vehicle turn into the store parking lot. Ms. Davenport then crossed the street so she could enter the store. As she neared the door, she heard arguing.

Ms. Davenport waited for the arguing to calm down before she knocked. The defendant let her in and the young man who had been arguing with the defendant left while she was shopping. While inside, Ms. Davenport noticed a condom package on the counter. The defendant was wearing a T-shirt, but he was naked from the waist down. Ms. Davenport did not leave. Instead, she stayed at the store with the defendant for thirty to forty-five minutes and got high on crack cocaine supplied by the defendant.

The young man returned after about fifteen minutes. The defendant let the young man into the store, and the young man told the defendant that an ATM card was not working and that the machine had kept the card. The young man was upset and kept repeating that he wanted his money. The defendant did not pay attention to

4

the young man. The young man told the defendant, "[I]f I was like one of the rest of these little youngsters, I'd be whooping your _ss." The defendant responded that the young man did not know with whom he was dealing. The defendant did not act at all worried when the young man threatened him. The defendant told the young man to take his girlfriend home and then come back to the store.

The young man left, and the defendant asked Ms. Davenport if she wanted to accompany him and the young man to Super One. Ms. Davenport was high and feeling nervous, so she refused. When Ms. Davenport suggested that the defendant finish dressing before he left the store, the defendant yelled at her to not tell him what to do. The young man returned to the store, having dropped off his girlfriend, and Ms. Davenport left. As she was walking out, the young man told her that she was going to be reading about the defendant. The young man was not armed at any time while in Ms. Davenport's sight. Ms. Davenport did not see the young man after that night. Ms. Davenport identified the corpse depicted in the photographs marked S-7, S-8, and S-9 as the young man who was at the store that evening.

Sergeant William Bates, a crime scene detective with the Alexandria Police Department, testified for the state. Sergeant Bates investigated Mr. Quinney's murder. During the investigation, Sergeant Bates collected two cotton swabs of blood from the defendant's carport driveway, two cotton swabs of blood from the threshold entry to defendant's house from the carport, two cotton swabs from a bloodstain on the screen door of that entry, two cotton swabs of suspected blood from the defendant's bathtub, and bloodstain swabs from the defendant's car. Sergeant Bates went to Memphis, Tennessee to execute a search warrant on the defendant's car. For comparison, the

5

investigators took buccal swabs and blood samples from the defendant. Sergeant Bates also collected a blood sample from the victim.

The prosecution called Connie Brown to testify as an expert in DNA analysis. Ms. Brown analyzed the blood samples in the instant case. The blood taken from the defendant's carport screen door matched Mr. Quinney's DNA. The carport driveway and door swabs yielded no DNA evidence. The bathtub swabs matched the defendant's DNA, which is not unusual since it was the defendant's bathtub. The blood swabs from the passenger seat of the defendant's car matched Mr. Quinney's DNA.

The state recalled Sergeant Bates. Sergeant Bates became involved in the investigation on February 29, 2005, when another officer told him that Mr. Quinney had disappeared and that the authorities suspected foul play. On March 1, 2005, Sergeant Bates participated in executing a search warrant on the defendant's store and residence to search for signs of a struggle. At the defendant's home, the officers seized a disposable camera. After searching the defendant's home, law enforcement officers began looking for Mr. Quinney's body.

On March 3, 2005, Sergeant Bates obtained the pieces of the previously mentioned credit card from Hibernia, the bank's surveillance video, and a disposable camera the defendant had given to his mother. Sergeant Bates then assisted in executing a second search warrant on the defendant's residence. This time, officers seized blood evidence. Sergeant Bates found some hand towels hanging in the bathroom that showed spots when sprayed with luminol, which reacts and fluoresces when in contact with blood.

A tall levee on Red River borders the defendant's property. The levee is separated from Red River by woods. On March 4, 2005, a search team gathered to search the woods across the levee from the defendant's house. On the opposite side of the levee from the defendant's residence, officers discovered a trail where something had been dragged through the brush. Officers found Mr. Quinney's naked body near a pair of cinder blocks in the woods at the base of the levee. Mr. Quinney's body had been stabbed repeatedly both in front and in back. The nearby cinder blocks, which appeared to have been moved from the defendant's house, had recently been set in place. Officers repeatedly searched for Mr. Quinney's clothing and the murder weapon, but they were not able to locate them.

Next, Sergeant Bates executed the search warrant on the defendant's car on March 14, 2005. Sergeant Bates also obtained consent to search for blood stains from the defendant's wife prior to traveling to Memphis, Tennessee, where the car had been stored. During the search, Sergeant Bates discovered two apparent stab holes in the vehicle's headliner and a graze on the plastic control center also on the car's ceiling. The search of the defendant's vehicle revealed blood, which had dried in the crevasses and seams of the car's passenger seat. Sergeant Bates submitted all of the blood samples for DNA testing.

When Sergeant Bates executed a search warrant on the disposable camera, he had the photographs developed by the crime scene bureau's photo processing lab. The processed pictures depict the defendant with blood on him: his hands, his face, his scalp, his legs, his shirt. The blood appeared to have been transferred onto the defendant rather than bled by the defendant. Sergeant Bates' investigation revealed that the defendant's wife had taken the photographs.

7

On the second day of trial, Dr. Collie Trant, a forensic pathology expert, was the first person to testify for the state. Dr. Trant became involved in the case when the coroner who performed the autopsy died. Dr. Trant issued Mr. Quinney's autopsy report. Mr. Quinney's body had many sharp force injuries and several blunt force injuries:

(1) stab wound to the right back, seven inches deep and through the lung, inflicted with a back to front motion, possibly fatal by itself if left untreated;

(2) stab wound to the upper right arm, inflicted with a front to back and right to left motion, possibly a defensive wound because of its position and half-inch depth;

(3) stab wound to the upper front neck, two inches deep, inflicted with a front to back and slightly downward motion, postmortem since there was no associated hemorrhage;

(4) stab wound to the lower front neck, two inches deep, inflicted with a front to back and slightly left to right motion, possibly fatal by itself if left untreated;

(5) stab wound to the front lower neck, two inches deep, inflicted with a front to back and right to left motion, eventually fatal as it punctured both the trachea and the esophagus;

(6) stab wound to the upper middle chest/lower neck, half an inch deep, inflicted with a front to back motion, not fatal;

(7) stab wound to the lower right side of the neck, thirty degrees from vertical, inflicted with a downward and right to left motion;

(8) stab wound to the upper right side of the neck, four inches deep, inflicted with a downward and right to left motion, fatal without immediate treatment as it passed through both the jugular vein and carotid artery;

(9) stab wound to the right upper chest, six inches deep, inflicted with a front to back and right to left motion, fatal as it punctured the aorta and the esophagus, caused Mr. Quinney to fall unconscious due to blood loss;

(10) stab wound to the middle left chest, seven inches deep, inflicted with a front to back motion, pierced Mr. Quinney's lung;

8

(11) cut to the right index finger, one-eighth of an inch deep, inflicted by a horizontal motion, defensive wound;

(12) stab wound to the upper back neck, four inches deep, inflicted with a back to front motion, possibly paralyzed Mr. Quinney because it cut into the spinal cord, fatal;

(13) stab wound to the upper left back, three quarters of an inch deep, inflicted with a back to front motion;

(14) stab wound to the lower back neck, five inches deep, inflicted with a back to front motion, did not damage anything significant;

(15-20) superficial stab wounds to the upper back, depth ranging from four fifths of an inch to five inches, inflicted with back to front motions, spacing indicates that Mr. Quinney was immobile when they were inflicted, none of the wounds caused significant damage;

(21) cut to the top of the head, one half inch deep;

(22) lacerations on the lips caused by a blow from a blunt object sufficiently forceful to split the skin, a large contusion to the right elbow, contusions associated with all sharp force wounds except the postmortem stab wound, abrasions on the abdomen, chest, back, arms, and face from being dragged.

All of the stab wounds were made by a single-edge knife. The damage would have taken about ten minutes to inflict. If the injuries were inflicted in a vehicle, there would possibly be cut marks in the car due to the confined space. Also, there would be blood around Mr. Quinney in the vehicle.

Additionally, Mr. Quinney had postmortem wounds to his genital area. The body had a hole above the penis, which had been skinned. That skin, Mr. Quinney's scrotum, and his testicles were all missing. None of the defects were made by animals although animals can cause the same type of defects. The edges of the wounds were relatively smooth rather than scalloped, showing that the genital injuries were incised by a knife instead of animal teeth.

Dr. Trant opined that, based on the insect eggs and larvae, the body had probably been where it was found for a day or two. However, if the weather was cold, it could inhibit blowfly activity. If a body had been lying in field for the length of time it took to find Mr. Quinney, the body would be filled with maggots, and the larvae would have eaten at the wounds until it would have been difficult to determine what caused them. In contrast, Mr. Quinney's body was relatively well-preserved for the area in which it was found. Overall, the insect activity and the decomposition of the body were consistent with Mr. Quinney having been dead since his disappearance.

The prosecution called Detective Cedric Green with the Alexandria Police Department to testify as its final witness. Detective Green was the case agent in the investigation of the disappearance and death of Mr. Quinney. Detective Green learned that the defendant had been the last person seen with Mr. Quinney. On Friday, February 25, 2005, Detective Green spoke to the defendant on the telephone, and the defendant stated that he would call Detective Green the following Monday. The defendant did not call until Tuesday, and during that conversation, the defendant volunteered to visit Detective Green's office the next morning. The defendant insisted on having an attorney present during the interview. The defendant never reported to Detective Green's office.

When the defendant failed to call on Monday as promised, Detective Green became suspicious. On Tuesday morning, Detective Green went by the defendant's store and discovered that it was closed, stopped at the defendant's house and found out that no one was home, and drove to the local school and learned that the defendant and his wife had withdrawn their children. Based on his findings, Detective Green became even more suspicious of the defendant, so Detective Green obtained warrants to search

the defendant's home and business. During the investigation, Detective Green learned that the defendant had relatives in Tennessee. As a result, he contacted them and told them that he was looking for Mr. Quinney's body and the defendant's car.

On Thursday, March 3, 2005, an informant told Detective Green that the defendant had returned to the area. Detective Green found the defendant's wife at the defendant's mother's house, and the defendant's wife told him that defendant was at the VA hospital. When the hospital released the defendant, Detective Green detained him and had him transported to police headquarters. The defendant's physical condition was documented when he arrived. He had a black eye and a scabbed-over injury to his right forearm.

After speaking with the defendant, the investigators had enough information to believe that Mr. Quinney's body would be found in a wooded area near the defendant's residence. As a result, a multi-agency search team looked for Mr. Quinney's body in the wooded area behind the defendant's home. The searchers found Mr. Quinney's body the following day. When the Memphis police informed Detective Bates that they had located the defendant's car, Detective Green and Detective Bates went to Tennessee. After getting the defendant's wife's permission to search the car and a search warrant signed by a Tennessee judge, Detective Bates searched the vehicle with Detective Green present.

In order to rebut the state's evidence, the defense called the defendant to testify as its sole witness. The defendant attested that Mr. Quinney had initiated an incident around 3:00 a.m. by hitting the defendant in the eye with the butt of a gun. When the defendant fell out of his chair, Mr. Quinney again struck the defendant with the butt of the gun, hitting the defendant's arm. Mr. Quinney then pointed the gun at the

11

defendant's face and told the defendant that he was going to take everything since the defendant owed him ninety dollars. In response, the defendant gave Mr. Quinney the $200.00 he had in the store as well as his watch and jewelry. Mr. Quinney kept the gun pointed at the defendant, forced him into the Cadillac, and made the defendant take the driver's seat while Mr. Quinney took the passenger seat. The defendant stated that he was crying at that point. Complying with Mr. Quinney's instructions, the defendant drove to his house while another vehicle followed. When the defendant parked, Mr. Quinney hit him in the nose with the gun and took the keys. The defendant grabbed a kitchen knife he had in the car left over from his supper. When the defendant stabbed Mr. Quinney with the knife, Mr. Quinney dropped the gun, opened the passenger door, and tried to exit the vehicle. The defendant grabbed Mr. Quinney by the shirt collar, twisted the fabric around his hand, and stabbed Mr. Quinney in the chest. Before the defendant stabbed Mr. Quinney the second time, Mr. Quinney picked the gun back up, holding it with the barrel facing away from the defendant.

On cross-examination, the defendant changed his story. He added that, after he initially stabbed Mr. Quinney, he stabbed at Mr. Quinney a second time as Mr. Quinney clutched the stab wound and tried to open the car door. The defendant grabbed Mr. Quinney's collar to pull him back into the vehicle only after jabbing at Mr. Quinney who was attempting to retreat. The defendant stabbed Mr. Quinney again after he pulled Mr. Quinney back into the car and Mr. Quinney had picked up his gun, holding it with the barrel facing away from the defendant.

Mr. Quinney again tried to move away from the defendant, but the defendant followed him out of the passenger side of the car. The two men struggled until they

both fell in the ditch at the front of the defendant's residence, Mr. Quinney landed face down with his head on the defendant's knees and his body across the defendant's legs. Mr. Quinney lay unmoving with his gun arm tangled in his shirt. While in that position, the defendant stabbed Mr. Quinney several more times. The defendant denied inflicting injuries to Mr. Quinney's genitals and stated that the stab wounds to Mr. Quinney's throat must have been exit wounds to where he stabbed Mr. Quinney in the back of the neck. In spite of his denial, the defendant admitted on cross-examination that he stabbed Mr. Quinney in the throat, as opposed to the neck. The defendant averred that he was afraid because he did not want his family's sanctuary violated.

The defendant looked up and saw the driver from the other vehicle approaching with some rope and duct tape in his hands. The defendant jumped up, ran to the rear of his house, and kicked in the back door. The defendant told his wife that somebody was trying to kill him and wedged a chair under the doorknob. The defendant instructed his wife to not let them in. The defendant again reported that he was crying. After awhile, the defendant had his wife photograph him. Then, he changed clothes and went outside to move the body. The defendant's wife placed his bloody clothing in a plastic bag.

The other vehicle and its driver had left when the defendant exited his house. The defendant pulled Mr. Quinney's shirt off, grabbed him by the hand, and began to drag the body. Mr. Quinney's oversized trousers and underpants had shifted to his ankles when Defendant stopped by the carport to rest. At that point, the defendant removed Mr. Quinney's remaining clothes and put them in the corner of his backyard. The defendant then pulled Mr. Quinney up the levee by his feet and down the levee by his hand. After stopping for a rest, the defendant grabbed Mr. Quinney's legs and

dragged him to where the body was discovered. The defendant returned home, collected Mr. Quinney's clothing, and gave them to his wife to bag. The defendant picked up the gun and the knife, put them in a brown paper bag, and individually dropped the gun, the knife, and the bag in a bayou as they left town. They threw the bag with Mr. Quinney's clothing into a dumpster.

After the defense rested, the prosecution recalled Sergeant Bates as a rebuttal witness. Sergeant Bates testified that the lock on the defendant's back door had been intact when investigators searched the home. Sergeant Bates also refuted testimony by the defendant that he and his wife stopped taking pictures because the film ran out. He averred that there were fourteen unexposed frames left on the disposable camera.

## DISCUSSION

The defendant contends that "[t]he evidence is insufficient to convict the defendant of second degree murder." The defendant argues that the jury should have acquitted him based on his justification defense; or alternatively, a manslaughter conviction was more appropriate.

Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1(A)(1).

> In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; *see State v. Neal*, 2000-0674[,] p. 9 (La.6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory test of La. R.S. 15:438 "works with the *Jackson* constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt

beyond a reasonable doubt to a rational jury." *Neal*, 2000-0674[,] p. 9, 796 So.2d at 657.

*State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170.

Louisiana courts have held that a showing that a defendant inflicted multiple cut, slash, or stab wounds on a victim is sufficient to support a finding that the defendant intended to commit second degree murder. *State v. Pagan*, 04-1478 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, *writ denied*, 05-2003 (La. 2/17/06), 924 So.2d 1013; *State v. Mackens*, 35,350 (La.App. 2 Cir. 12/28/01), 803 So.2d 454, *writ denied*, 02-413 (La. 1/24/03), 836 So.2d 37; *State v. Bates*, 95-1513 (La.App. 1 Cir. 11/8/96), 683 So.2d 1370; *State v. Segura*, 464 So.2d 1116 (La.App. 3 Cir.), *writ denied*, 468 So.2d 1203 (La.1985). Additionally, when a defendant flees or attempts to avoid apprehension, the trier of fact may infer a guilty conscience. *State v. Cazenave*, 00-183, 00-184 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, *writ denied*, 00-3297 (La. 10/26/01), 799 So.2d 1151 (*citing State v. Fuller*, 418 So.2d 591, 593 (La.1982)).

The evidence shows that the defendant repeatedly stabbed Mr. Quinney over a ten-minute period until after Mr. Quinney expired. After Mr. Quinney died, the defendant stabbed him at least once more and then mutilated the body. The defendant then concealed the body and disposed of evidence before fleeing Louisiana with additional evidence. Thus, the evidence shows that the defendant had the specific intent to kill Mr. Quinney and that Mr. Quinney died of the injuries inflicted by the defendant. Accordingly, when viewing the evidence in a light most favorable to the prosecution, the state introduced sufficient evidence at trial to prove beyond a reasonable doubt that the defendant was guilty of the second degree murder of La'Kedric Quinney.

15

JUSTIFICATION

Homicide is justifiable in some instances: in cases of self defense; if necessary to prevent a violent or forcible felony involving danger to life or great bodily harm; in situations where the offender reasonably believes the victim is likely to use unlawful force against a person present in a dwelling, business, or motor vehicle; and when the offender is lawfully inside a dwelling, business, or motor vehicle and the offender reasonably believes that deadly force is necessary to either repel an intruder or force the intruder to leave the premises. La.R.S. 14:20. "When a defendant claims self-defense in a homicide case, the State bears the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Loston*, 03-977, p. 9 (La.App. 1 Cir. 2/23/04), 874 So.2d 197, 204, *writ denied*, 04-792 (La. 9/24/04), 882 So.2d 1167.

In examining a claim of self-defense, it is necessary to consider: (1) whether the defendant had a reasonable belief that he was in immediate danger of death or great bodily harm; (2) whether, under circumstances such as the possibility of escape, killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict. *State v. Jenkins*, 98-1603 (La.App. 4 Cir. 12/29/99), 750 So.2d 366, *writ denied*, 00-556 (La. 11/13/00), 773 So.2d 157. "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21. In the instant case, the jurors were not instructed on the aggressor doctrine.

In *Bates*, 683 So.2d at 1377, the first circuit stated:

16

The number and character of stab wounds as described by Dr. Cefalu in his testimony and autopsy report furnishes sufficient evidence to support a finding of the specific intent to kill or inflict great bodily harm required for second degree murder. Based on the defendant's own account of the incident reflecting that he stabbed the victim after disarming her, a rational trier of fact could have reasonably concluded that the killing was not necessary to save [the] defendant from the danger envisioned by [La.R.S.] 14:20(1) and/or that [the] defendant had abandoned the role of defender and taken on the role of an aggressor and, as such was not entitled to claim self-defense. Consequently, the trial court's rejection of the defense of justifiable homicide is supported by these circumstances.

(citations omitted).

In a later case, the fourth circuit agreed that self-defense does not apply to cases where a defendant disarms an attacker and then proceeds to stab the unarmed attacker numerous times. *Jenkins*, 750 So.2d 366. "Even if the jury accepted the defendant's statement that the victim approached him with a knife, the defendant admitted that he disarmed the victim. At that point, the defendant could have left. Instead, the defendant used the knife to inflict injuries to the victim." *Id*. at 377.

In *State v. Pittman*, 93-892 (La.App. 1 Cir. 4/8/94), 636 So.2d 299, the first circuit examined a case wherein the larger defendant asserted that the smaller victim had approached him with a knife, the victim discarded the knife when the fight began, the defendant beat the victim unconscious, then the defendant continued to beat the defenseless victim; based on those facts, the first circuit rejected the defendant's justification defense. In an earlier case, the first circuit also held that a continued attack on an unconscious victim was sufficient to negate a justifiable homicide defense. *State v. Jones*, 598 So.2d 511 (La.App. 1 Cir. 1992). Also, a defendant's concealment of the body is inconsistent with a self-defense argument. *State v. Patorno*, 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141.

17

The only testimony in the record describing the actual homicide is the defendant's self-serving account of the incident. If one accepts the defendant's account of the events leading to Mr. Quinney's death together with the physical evidence, the aggressor doctrine prevents the defendant from being successful in a justification defense. The record shows that, under the facts of the defendant's story, Mr. Quinney dropped his weapon and attempted to retreat after the defendant stabbed him the first time.

When Mr. Quinney tried to escape, the defendant continued the confrontation by stabbing at the retreating unarmed victim then by physically pulling Mr. Quinney back into the confrontation. When Mr. Quinney retrieved his weapon, he made no attempt to point it at or to use it on the defendant. Nevertheless, the defendant continued to stab Mr. Quinney. Again, Mr. Quinney attempted to retreat from the confrontation. This time, the defendant followed Mr. Quinney out of the car in order to continue the altercation. The parties struggled and eventually fell. Even after Mr. Quinney lay motionless, the defendant continued to stab Mr. Quinney. Expert testimony revealed that it would have taken the defendant about ten minutes total to inflict the number of stab wounds found on Mr. Quinney. Moreover, since at least six of the stab wounds to the neck were inflicted after incapacitation and because there were only two defensive wounds, the defendant probably inflicted the remaining throat wounds, which were also inflicted in a relatively tight pattern, after Mr. Quinney had been incapacitated.

Thus, under the defendant's account of events, his actions were not justified as he became the aggressor after the first stab when he sought confrontation with the retreating unarmed victim even though Mr. Quinney may have been the initial

18

aggressor in the altercation. After the defendant became the aggressor in the conflict, he inflicted twenty additional sharp force injuries to Mr. Quinney.

The jury apparently disbelieved the defendant.

When the evidence is viewed in the light most favorable to the prosecution, there is sufficient evidence in the record to disprove the defendant's justification defense beyond a reasonable doubt.

MANSLAUGHTER

The defendant contends that the repeated tight patterns of stab wounds make it abundantly clear that he was acting from either extreme fright or heat of passion. Second degree murder becomes manslaughter when "the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31. If a jury finds that a defendant committed second degree murder, it must then determine whether the circumstances of the crime indicate that it was actually manslaughter. *State v. Jack*, 596 So.2d 323 (La.App. 3 Cir.), *writ denied*, 600 So.2d 611 (La.1992).

"Manslaughter exists if a defendant can prove by a preponderance of the evidence that mitigating factors, such as provocation, exist." *State v. Paddio*, 02-722, p. 12 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, 1128-29, *writ denied*, 03-402 (La. 2/13/04), 867 So.2d 682. Heat of blood or sudden passion is an act committed in response to such provocation as would deprive an average person of his self-control and cool reflection. *State v. Charles*, 00-1611 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420. In order to establish provocation, there must be some act or series of actions by Mr. Quinney that would be sufficient to deprive a reasonable person of cool reflection. *Id*. The adequacy of the provocation

19

and the amount of time in which a defendant's blood should have cooled are primarily questions for the jury. *State v. Ducksworth*, 496 So.2d 624 (La.App. 1 Cir. 1986); *see also Bates*, 683 So.2d 1370. Thus, the jury must have concluded either that there was insufficient provocation for the defendant to kill Mr. Quinney or that the defendant was not acting out of heat of blood or sudden passion.

A jury may rationally reject manslaughter in favor of the more severe crime of second degree murder if the victim bore defensive wounds and if the evidence showed that the defendant continued to stab his victim after the victim was incapacitated. *State v. Jordan*, 31,568 (La.App. 2 Cir. 2/24/99), 728 So.2d 954, *writ denied*, 99-893 (La. 10/8/99), 750 So.2d 177; *see also State v. Knowles*, 598 So.2d 430 (La.App. 2 Cir. 1992). Evidence of flight, concealment, and attempt to avoid apprehension indicates consciousness of guilt. *State v. Hamilton*, 99-523 (La.App. 3 Cir. 11/3/99), 747 So.2d 164 (*citing State v. Davies*, 350 So.2d 586, 588 (La.1977)). A defendant's pursuit of his victim indicates that the defendant was not acting in the heat of blood or sudden passion. *State v. Arabie*, 496 So.2d 554 (La.App. 1 Cir.), *writ denied*, 502 So.2d 565 (La.1986). "Our law may extend some limited indulgence to passion justly excited, but it does not indulge revenge." *Id*. at 558.

A review of the evidence presented at trial reveals that a rational trier of fact could have concluded that the defendant failed to establish the necessary mitigating factors by a preponderance of the evidence. The jurors, who were free to reject or accept, in whole or in part, the testimony of any witness, could have reasonably discounted the defendant's self-serving testimony and believed that the victim was unarmed. *Patorno*, 822 So.2d 141. The jury may also have concluded that Mr. Quinney did not attempt to rob the defendant. Instead, the defendant attacked Mr.

Quinney because he did not want to pay for his illicit drug purchase. Thus, the jurors could have reasonably believed that the defendant had insufficient provocation for attacking Mr. Quinney.

Also, the defendant testified that he was afraid and acting from fear. The jurors could have reasonably found that the defendant's fear was irreconcilable with his actions. The defendant averred that he pursued the fight by pulling the unarmed and retreating victim back into the altercation; the jury may have reasonably concluded that someone who was frightened to the point of panicking would have been more likely to allow his attacker to get away while escaping in the opposite direction. Thus, rational jurors could have concluded that the defendant failed to prove that he acted from fear or from heat of blood, sudden passion, or a loss of cool reflection.

Therefore, a rational trier of fact could have found that the defendant failed to establish by a preponderance of the evidence the presence of the mitigatory factors necessary for reducing his conviction from second degree murder to manslaughter.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## CONCLUSION

The defendant's conviction is affirmed.

**AFFIRMED.**

21