## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-238

**STATE OF LOUISIANA**

**VERSUS**

**PATRICK LEVIER**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 112212
HONORABLE JOHN DAMIAN TRAHAN, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Marc T. Amy, Billy Howard Ezell, and James T. Genovese, Judges.

**AFFIRMED.**

**Michael Harson**
**District Attorney, Fifteenth Judicial District Court**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**Counsel for Appellee:**
**State of Louisiana**

**Carey J. Ellis, III**
**Louisiana Appellate Project**
**707 Julia Street**
**Rayville, LA 71269**
**(318) 728-2043**
**Counsel for Defendant/Appellant:**
**Patrick Levier**

**Patrick D. Magee**
**P. O. Box 3527**
**Lafayette, LA 70502-3527**
**(337) 232-9700**
**Counsel for Appellee:**
**State of Louisiana**

**Patrick Levier**
**Louisiana State Penitentiary**
**Walnut - 4**
**Angola, LA 70712**

**EZELL, JUDGE.**

The Defendant, Patrick Levier, was charged by indictment with second degree murder, a violation of La.R.S. 14:30.1. On November 29, 2007, the jury rendered a verdict of guilty as charged in a ten-out-of-twelve decision. On January 28, 2008, the Defendant was sentenced to life imprisonment without the benefit of probation, parole or suspension of sentence.

The Defendant filed a "Motion for Post Verdict Judgment of Acquittal or Modification of Verdict." After a hearing on the matter, the trial court denied the motion. On appeal, the Defendant asserts the State presented insufficient evidence to convict him of second degree murder.

**FACTS**

On June 18, 2006, the Defendant shot and killed Nelson Lewis. At trial, the forty-year-old Defendant testified he was five foot six and one-hundred and thirty-nine pounds. He worked in the construction business, specifically building bridges, as a "rise buster" for seventeen years. The Defendant admitted he had two prior misdemeanor convictions. The Defendant explained he first met Mr. Lewis at a night club, and they became friends. The Defendant testified he and Mr. Lewis would meet and that he visited Mr. Lewis's home.

In June 2004, the Defendant and Mr. Lewis were working together and had a confrontation. The Defendant testified he asked Mr. Lewis if he could get on the bulldozer because he was cold. According to the Defendant, Mr. Lewis refused, got off the machine, pulled a knife, and threatened to cut the Defendant. The Defendant stated Mr. Lewis was several inches taller than he and weighed about one-hundred pounds more than he.

1

The Defendant recalled another incident in which the victim pulled a knife occurring at the Defendant's home. The Defendant explained Mr. Lewis came to his house, exited the car, walked up to Jerry Tezeno, a friend of the Defendant's, pulled a knife, and threatened to make an "X" on Mr. Tezeno's forehead. Mr. Tezeno testified at trial corroborating the incident.

The Defendant testified that three months before the incident, Mr. Lewis began calling his girlfriend, Brenda Thibodeaux. During these phone calls Mr. Lewis accused the Defendant of cheating with other women, and he made advances toward Ms. Thibodeaux. The Defendant stated he asked Mr. Lewis to stop calling Ms. Thibodeaux, but Mr. Lewis continued to call. Consequently, as a result of Mr. Lewis's actions, the Defendant went to the police twice. According to the Defendant, after the second complaint to the police, the police visited Mr. Lewis.

Ms. Thibodeaux testified that on the morning of June 18, 2006, she and the Defendant were arguing. During the argument, she told the Defendant that Mr. Lewis offered to take her to the casino and to give her money. Ms. Thibodeaux testified she refused the offer.

Around 6:30 p.m., on the evening of June 18, 2006, the Defendant was riding on Simcoe Street in Lafayette, when according to the Defendant, Mr. Lewis flagged him down and asked him to meet him in the parking lot between Simcoe and Louisiana Avenue. The Defendant denied he went looking for Mr. Lewis. The Defendant testified when he arrived at the parking lot, Mr. Lewis was there. Both men exited their vehicles, and the Defendant told him "I went to Mr. Will's house and tell Mr. Will I had called the cop on you for you to leave me alone. That's what I want you to do, just leave me alone." According to the Defendant, Mr. Lewis walked up to him, and the Defendant pushed Mr. Lewis. The Defendant testified he told Mr.

2

Lewis to stop because he did not want any trouble. The Defendant stated Mr. Lewis reached in his pocket, grabbed his knife, and walked "on me." The Defendant testified he saw the knife when Mr. Lewis grabbed it from his pocket and pulled it up. At that time, the Defendant drew his gun and said "stop." The Defendant testified Mr. Lewis did not stop, and he shot him. According to the Defendant, Mr. Lewis continued coming toward him, and he shot him again. Mr. Lewis then spun around, and the Defendant shot him two more times.

When asked why he was carrying his gun when he met Mr. Lewis, the Defendant explained he kept his gun in the console of his truck, and he put his gun in his pocket because Mr. Lewis always carried his knife. Ms. Thibodeaux testified she had once seen a gun in the Defendant's truck in the glove compartment.

The Defendant further explained why he was carrying the gun, stating in pertinent part:

Q     And tell me again, why was this in your pocket?

A     I put it -- I put it in my pocket for protection, and -- and I knew Nelson -- he always carry his knife with him. He never leaves his knife with him -- he always carry his knife with him. And I just went there, like to say, you know, I thought we was just going to just talk, you know. He just got all out of control with me.

Q     You knew at the time that you put this gun in your pocket that you were going to talk with him?

A     Well, I didn't -- like I say, I put it in my pocket. I ain't never thought that was going -- like we was going to have no altercation or nothing.

Q     But you also had in your mind the fact that at least twice before, once against you and once against Gerald [Jerry] Tezeno, you had seen --

A     Well, I seen what he did to Gerald [Jerry], and I seen what he had did to me. I couldn't trust him, you know. I put my gun in my pocket.

3

Q      What did you think would happen to you if Nelson had pulled his knife out?

A      Nelson was going to stab me. If I stay there, he was going to stab me up. I probably never been here today now.

Q      When you pulled your pistol out and started pulling the trigger, did you feel that you were in danger?

A      I feel -- I was in fear for my life. I was feeling danger. I was.

Q      Did you know that this very sharp knife was in his pocket?

A      No, not that knife there.

Q      But you knew that he had some knife?

A      Well, I knew he had a knife. He always carry a big pocket knife with him.

Q      And it's this danger that you were trying to protect yourself from?

A      I was trying to protect myself from that, you know, for him not cutting me with his knife. And I was [sic] feared for my life.

After he shot Mr. Lewis, the Defendant drove to Ms. Thibodeaux's house and told her what happened. Also, he phoned his friends Clay Bertrand, Al Malveaux, Harold Lazard, and his mother to tell them about the incident.

Next, he went home to change his clothes and went to his neighbor's, Elsie Bouttee's, house. The Defendant told Ms. Boutte what happened and asked her to take him to the police station.

At the police station on the evening of the shooting, the Defendant gave a statement to the police admitting he shot Ms. Lewis. During the trial, the statement was admitted into evidence and read to the jury. This statement provided in pertinent part:

PL: All right all this happened when I use [sic] to work with Nelson for the city, I had worked with him probably about two months if I'm not mistaken and uh he, he keep fussing in the field. Hey man. I say you change on me, why you do that why you fussing at me. You know I understand I know I'm operating the dozer and stuff and uh he kept

4

fussing at me man, kept fussing at me you know and you know and then me and him got in a big argument in the field and uh, and then after that we got to start fussing again you know and then he pulled a knife on me. . . . . It was just me, it was just me and him and uh I never made a big deal out of it you know and that after that I, we kept, we made back friends after that you know we kept you know I kept I went by his house a few times, he came by mine you know and then after that my old lady calls telling me how . . . .

. . . .

PL: And she kept telling me things about I would be with this girl and I know I wasn't you know. I know me and Nelson use to go to different places you know and she kept telling me that and so I put two and two together I knew it was Nelson kept telling my lady all the things was going on about me saying I was messing...or I cheated this and that and I know I wasn't. And uh that kept on going. She kept throwing things in my face what Nelson said, Nelson said, I keep cheating on that's why you and me, that you and me, just (inaudible) like that you need to be with me. I wouldn't mind giving you $300.00, maybe $300.00 or $400.00 to be with you, you don't need that dude you know. . . .

. . . .

PL: Nelson. And uh he said meet me on the next street and uh I then met him on the next street and uh..

BR: What vehicle was Nelson in?

PL: He was in a lil'red, a lil'red Sunfire.

SR: And what were you in?

PL: I was in my blue Chevrolet truck a (inaudible)...

BR: Okay.

PL: I had uh I had met you know to go talk to him. I asked him why he doing that. He didn't (inaudible) he kept coming on me. I said stop.

BR: What do you mean coming on you?

PL: Well he kept walking on me. He say yeah.

BR: Walking toward you?

PL: Walking towards me.

BR: Okay.

5

PL: And he came in my face. I said look stop man and I pushed him out my way. I said no, don't come on me like this. I don't know what you gon' do and he, he kept coming again and uh he, then he dug in his back pocket and then I pull my gun out and then I shot him.

BR: Where did you [sic] gun from?

PL: Oh I been bought my gun.

BR: Now what..

PL: Well I had my gun in my back pocket.

BR: Okay.

PL: In my, in my left pocket.

BR: Was it in your right [sic] pocket the whole day today or?

PL: No I just took it out of my console and put it in my pocket.

BR: The console of your truck?

PL: Yeah, Just out my truck, put it in my pocket, I didn't know, I know he always carry his knife with him you know.

BR: Uh-huh.

PL: You know I didn't know what he was gon' do when I was gon' talk to him you know.

BR: So before right before you met with him and you took it out of the console of your truck..

PL: I took it out of the console of my truck and put it in my back pocket.

BR. When did you do that?

PL: Well when I parked my truck, when he drove up and I got down I put my gun in my back, in my back pocket, I didn't know what he was gon' do.

. . . .

PL: Well what happened like I said he was coming, I said look you know I said why you going around telling Brenda all kinds of things about me. I said yeah you went told Will all this and that what I'm doing. He kept coming. I say don't come on me like this you know. I said stay away from me. He kept coming on me and then I pushed him out my way. I say don't come walking on me like that, what you gon'

6

do, then he dug in his back pocket where he usually keep his knife in his back pocket.

BR:  His right?

PL: In his right pocket. That's how he did it the last time to me in the field. He had it in his right pocket. I just took a chance with him you know I knew he got, he, he like. . .

BR: How far were y'all?

PL: He was kind of, well I mean he was coming on me when I had pushed him and he dug in his pocket he was coming on me.

BR: How far back was he whenever ...

PL: Well like, say like this him and I had push him, he came on, then I back up and then, it was chance [sic] for me to get my gun. I said look you need to back up. I say I don't want to shoot you man just back up. He kept coming on me and then I just shot him.

BR:  Where did you shoot him?

PL:  Somewhere in his stomach (inaudible)...

BR: How many times did you shoot?

PL: I think I shot like three or four times with the gun.

. . . .

BR: Why did you shoot him?

PL: Well I didn't chance [sic] he was digging in his back pocket, he was coming on me you know.

BR: Did you ever see him come out with anything?

PL: Well when he, when he dug in his pocket and he was coming on me I knew I, I back out the way you know and I grabbed my gun and I said stop man. He kept coming on me.

BR: So, but did you ever see him ...

PL: I never seen him when he...when he dig, when he dug in his pocket when he was coming on me, I hurried up and back [sic] and ran out the way and back up and pull the gun and I say stop, he kept coming on me with this [sic] hands still in his pocket.

BR: So the reason why you shot him is what?

7

PL: He had his hand in his pocket I thought he was coming to pull his knife out. I know he usually keep his knife in his pocket.

BR: Okay.

PL.: That's why I shot him for him not to come and stab with the knife or nothing.

BR:  Did you ever see him with this knife?

PL: Well I use to see him, well I never see him at the present time with the knife, with the knife at the time that I shot.

BR: On today?

PL: Today yeah when he dug in his pocket I never seen the knife in his pocket. I know he usually keep the knife and uh that's when he dig in his pocket. I know he usually keep that knife in that pocket, in his back pocket.

BR: But you never saw it[.]

PL: I never seen him with the knife, I don't know man, I don't know if the knife was in his pocket. He dug in, in his pocket to grab something.

BR:  So he could have been grabbing for his wallet....

PL: Oh no.

BR: But your perception was . . . .

PL: I perceive it like I know he did it once to me already in the field when I was with him in the city you know.

Brenda Thibodeaux testified Mr. Lewis started calling her three months before the incident telling her the Defendant was messing around with other women.  Ms. Thibodeaux acknowledged that the Defendant went to the police twice about Mr. Lewis harassing her.  On the morning of the incident, Ms. Thibodeaux recalled arguing with the Defendant and telling him, Mr. Lewis asked her to go to the casino with him and he offered to give her money.  Later that evening, Mr. Lewis came to her home and told her about the shooting.  He explained that they were in a heated

argument when Mr. Lewis reached for something and the Defendant shot him. Ms. Thibodeaux described the Defendant as nervous and crying.

Harold Lazard, a family friend of the Defendant for about twenty-five years, testified the Defendant called him and told him he shot Mr. Lewis four times. According to Mr. Lazard, the reason the Defendant gave for shooting Mr. Lewis was he was tired of Mr. Lewis saying stuff about him to his girlfriend. Mr. Lazard stated that the Defendant did not tell him anything about a knife. Mr. Lazard testified the Defendant told him prior to the day of the shooting about Mr. Lewis pulling a knife on him at work. Additionally, the Defendant had previously told him about Mr. Lewis harassing his girlfriend and going to the police about the harassment.

Elsie Boutte testified the Defendant told her he shot Mr. Lewis after Mr. Lewis called him all kinds of names and stuck his hand in his pocket like he was going to cut him with a knife. The Defendant, prior to the day of the shooting, told her about Mr. Lewis harassing his girlfriend and going to the police about the harassment.

Clay Bertrand, a former employer of the Defendant, testified on the day of incident, the Defendant called him very upset and told him he shot Mr. Lewis. The Defendant explained they met in the parking lot and walked toward each other. When he saw Mr. Lewis reaching in his pocket, the Defendant shot him because he knew Mr. Lewis carried a knife.

Hebert John Cross, a good friend of Mr. Lewis, was with Mr. Lewis on the evening of the incident. He and Mr. Lewis went down to Simcoe Street in Lafayette by the night clubs. According to Mr. Cross, the Defendant pulled alongside Mr. Lewis's car and asked Mr. Lewis to meet him around the corner at the intersection of Simcoe and Louisiana Avenue. Mr. Cross testified the Defendant did not ask in an angry manner. Mr. Cross recalled the Defendant and Mr. Lewis exited their vehicles.

9

Mr. Cross remained in the car, a Sunbird, with the windows up, except for a small crack. Mr. Cross stated neither the radio nor the air conditioner were on. Mr. Cross testified when the two men met each other the Defendant hollered "You told my old lady," reached in his pocket, and shot Mr. Lewis four times. Mr. Cross explained that after the first and second shot, Mr. Lewis was standing. Then, Mr. Lewis started backing up and turning; the Defendant shot again. Mr. Lewis turned all the way around, and the Defendant shot the fourth time. Mr. Cross testified Mr. Lewis did not say anything to the Defendant or make an aggressive move toward the Defendant. Mr. Cross admitted seeing a knife in Mr. Lewis' possession on the evening of the shooting, but not around the Defendant.

During the search of Mr. Lewis's car, the police found a large pocket knife. Corporal Kevern Stoute, with the Lafayette Parish Sheriff's Office, testified the knife, which was closed, was found on the driver's side between the seat and the door frame. Additionally, the State stipulated that a knife was found in Mr. Lewis's pocket during the autopsy. There was no testimony as to which pocket the knife was found or whether the knife was closed or opened.

Dr. Collie Trant, a forensic pathologist for the Lafayette Parish Corner's Office, testified he performed the autopsy on Mr. Lewis. His findings indicated gun shot wounds to the left abdomen, to the back, and two to the upper chest.

Additionally, three witnesses who were passing by the intersection at the time of the shooting testified they saw the Defendant shoot Mr. Lewis. None of the witnesses recalled seeing any aggressive behavior by Mr. Lewis.

## ASSIGNMENT OF ERROR

The Defendant asserts the State presented insufficient evidence to convict him of second degree murder. Specifically, the State failed to disprove his claim of self-defense.

In the motion seeking a post-verdict judgment of acquittal or modification of the verdict, the Defendant asserted the State failed to disprove the validity of his claim of self-defense. The Defendant noted that during trial he had shown the following:

(a) Mr. Lewis had, as known to Defendant, engaged in two separate knife attacks upon persons.

(b) Mr. Lewis had engaged in one prior knife attack on Defendant.

(c) Mr. Lewis had earned a reputation for carrying his knife(s).

(d) Mr. Lewis brought, not one, but two knives to the scene of the incident in which he lost his life.

(e) Mr. Lewis had embarked on a three month reign of terror and harassment against Defendant Levier and Levier's girlfriend. So great was the harassment that Mr. Levier contacted the police for assistance and protection, but the harassment persisted.

(f) Mr. Lewis participated in a meeting with Defendant and at that meeting, Mr. Lewis reached for the knife in his pocket.

At the hearing on the motion, the Defendant argued in pertinent part:

The circumstances were that there was one prior attack on the defendant by Mr. Lewis, and another act by Mr. Lewis on someone else at the defendant's home and in the defendant's presence. Mr. Lewis had two (2) knives at the scene, one that he had just readied apparently and set inside his vehicle door, the other in his pocket. Mr. Lewis reached for the knife which was in the pocket.

There are two threats, specific threats, that would decry [sic] criminal intent by Mr. Levier. The first threat, Mr. Lewis reaching for the knife, which he had prepared in his pocket, and Mr. Lewis' aggressive nature and aggressive acts. . .

. . . .

11

As to the matter of jury deliberation, clearly the jury -- there was reasonable doubt. Five-and-a-half (5½) hours of deliberation, and we could hear -- all of -- those of us who were in the courtroom could hear the yelling and loud and intense conversations that were taking place behind the door. Clearly, someone was deprived of their vote, and Mr. Levier [sic] deprived of his right to their vote and their opinion. Some person or persons just harangued and harassed, wore down, brow beat some jury members into voting with -- with them, and that is exactly what took place behind that door.

The State had an obligation to prove its case beyond a reasonable doubt. Viewed – all of these circumstances viewed in the most favorable light to the State, no rational trier of fact could have found a verdict of second degree murder.

The State countered:

[T]he jury rendered a verdict of ten (10) to two (2), Your Honor, for second degree murder. After hearing all the facts and circumstances surrounding this horrific incident, they still came back ten/two (10/2) for second degree murder.

There was no testimony, outside of the defendant's self-serving testimony, that there was an aggressive act by the victim. . . .

The trial court denied the motion stating:

There was evidence at the trial that the confrontation was created by Mr. Levier. Some of that testimony came from the passers-by on Louisiana Avenue or Simcoe Street, but the strongest testimony was from Mr. Lewis' passenger, who said that Mr. Levier approached Mr. Lewis and, without being provoked, said something about Mr. Lewis having told Mr. Levier's girlfriend something, and then without provocation, [shot] him four (4) times.

The jury was entitled to accept that testimony, if that's what they wanted to do. They apparently did. And I realize that the jury deliberations were lengthy. They were animated, as anyone near the courtroom - - could tell. But there's no evidence that there was any jury misconduct or that anyone was deprived of their own convictions and their own vote.

On appeal, the Defendant admits that he shot the Victim but argues his actions were justifiable. The Defendant asserts other than the testimony of Mr. Cross, the State failed to produce any evidence to support the Defendant's contention that its theory there was no aggressive behavior on the part of the Victim. The Defendant

12

argues Mr. Cross was in shock, a good friend of the Victim, and did not have a good angle to see what happened.

The State counters there were no eyewitnesses to support the Victim was aggressive. Additionally, the physical evidence showing that the Victim was shot four times, including one shot to his back, supported the State's theory.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

In *State v. Richards*, 06-1553, p.16 (La.App. 3 Cir. 5/2/07), 956 So.2d 160, 170-71, *writ denied*, 07-1129 (La. 12/14/07), 970 So.2d 529, the court held in pertinent part:

> Homicide is justifiable in some instances: in cases of self defense; if necessary to prevent a violent or forcible felony involving danger to life or great bodily harm; in situations where the offender reasonably believes the victim is likely to use unlawful force against a person present in a dwelling, business, or motor vehicle; and when the offender is lawfully inside a dwelling, business, or motor vehicle and the offender reasonably believes that deadly force is necessary to either repel an intruder or force the intruder to leave the premises. La.R.S. 14:20. "When a defendant claims self-defense in a homicide case, the State bears the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Loston*, 03-977, p. 9

(La.App. 1 Cir. 2/23/04), 874 So.2d 197, 204, *writ denied*, 04-792 (La.9/24/04), 882 So.2d 1167.

> In examining a claim of self-defense, it is necessary to consider: (1) whether the defendant had a reasonable belief that he was in immediate danger of death or great bodily harm; (2) whether, under circumstances such as the possibility of escape, killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict. *State v. Jenkins*, 98-1603 (La.App. 4 Cir. 12/29/99), 750 So.2d 366, *writ denied*, 00-556 (La.11/13/00), 773 So.2d 157. "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21.

Recently, in *State v. Mincey*, 08-1315 (La.App. 3 Cir. 6/3/09), ___ So.3d ___, this court reviewed whether or not the State presented sufficient evidence to disprove the defendant's defense of justification. In *Mincey*, the victim, Jerome Dejean, was at a nightclub. While at the club, the defendant bumped into Dejean on his way to and from the bathroom. The two exchanged words, and the defendant exited the club followed by two of the victim's friends, Jones and Doucet. The two friends confronted the defendant about the incident. An argument ensued, and the defendant advised them he had a gun. Dejean came out and confronted the defendant. The Defendant's mother, who was also at the club, intervened and stood between the defendant and Dejean in an attempt to mediate the dispute. As she placed her hand on Dejean's chest, he pushed her hand aside and attempted to punch the defendant. The defendant shot him in the chest and fled. "According to the defendant's mother, Dejean was in 'mid-swing whenever he got shot.'" *Id*. at ___.

On appeal, the defendant did not deny that he shot and killed the victim, but argued that the State failed to disprove that he acted in self-defense. Specifically, the defendant argued that the killing was justifiable because he had his back against the wall, and was surrounded by the victim and the victim's two friends. Additionally,

14

he contended that shooting the victim was the only way he could escape. Furthermore, the defendant claimed that one of the victim's friends had a firearm, but this was disputed by both of the victim's friends at trial. This court held in pertinent part:

> The essence of his defense is that he was justified in responding to an attempted punch by shooting his opponent in the chest at close range. We recognize that Dejean had two friends with him. Thus, Defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable. However, the level of force he used to defend himself was far beyond what was necessary under the circumstances.
>
> . . . .
>
> This analysis applies even if the jury believed the testimony of Defendant's most favorable witness, Ms. Bryant, the Defendant's mother.
>
> . . . .
>
> [A]s mentioned earlier, responding to an oncoming punch by shooting the other person in the chest is an excessive response. Thus, the jury's determinations in the present case were not unreasonable. Therefore, the Defendant's reliance on self-defense is meritless.

*Id*. at __.

In this case, the essence of the Defendant's defense is that he was justified in shooting Mr. Lewis because Mr. Lewis was reaching in his pocket, and the Defendant knew or saw he had a knife. According to the trial court, the jury apparently rejected the Defendant's testimony. Nevertheless, even if the jury believed the Defendant's testimony that Mr. Lewis dug in his pocket for the knife and Mr. Lewis was coming toward him, the level of force used by the Defendant was far beyond what was necessary. Consequently, this court finds the State presented sufficient evidence to disprove the Defendant's claim of self-defense. Accordingly, this assignment of error lacks merit.

15

## CONCLUSION

The Defendant's conviction and sentence are affirmed.

**AFFIRMED.**