NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 07-623

STATE OF LOUISIANA

VERSUS

KEARNEY ALSANDOR

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 05-K-2588-C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Oswald A. Decuir, and J. David Painter, Judges.

**AFFIRMED.**

**Earl B. Taylor**
**District Attorney**
**27th Judicial District Court**
**P. O. Drawer 1968**
**Opelousas, LA 70571-1968**
**(337) 948-3041**
**Counsel for Appellee:**
**State of Louisiana**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P. O. Box 2775**
**Monroe, LA 71207-2775**
**(318) 387-6124**
**Counsel for Defendant:**
**Kearney Alsandor**


**Kearney Alsandor**
**Hickory 3**
**Louisiana State Penitentiary**
**Angola, LA 70712**
**In Proper Person**

**SAUNDERS, Judge.**

On November 29, 2005, Defendant, Kearney Alsandor, was charged in a bill of indictment with second degree murder, in violation of La.R.S. 14:30.1. Defendant entered a plea of not guilty on February 17, 2006. A jury was selected on March 7, 2007, and trial began on March 21, 2007. The jury returned a verdict of guilty as charged on March 22, 2007. Defendant waived all legal delays and was sentenced to life imprisonment at hard labor, to be served without benefit of probation, parole, or suspension of sentence. Following sentencing, an oral motion for appeal was made and granted. A "Notice of Appeal, Request for Transcript and Request for the Appointment of the Louisiana Appellate Project to Handle the Appeal" was filed on March 29, 2007.

Defendant asserts one assignment of error in brief filed by counsel. Therein, Defendant contends the evidence presented at trial was not sufficient to convict him of the murder of Robert Rumback. We find that this assignment of error lacks merit. In his *pro se* brief, Defendant asserts six assignments of error, which contain the following claims:

1. The prosecution knowingly used false testimony to obtain a tainted conviction and defense counsel was ineffective in failing to impeach such false testimony.

2. During jury instruction, the prosecution misstated the law, purposely misleading the jury.

3. The prosecution's use of peremptory strikes against African-American prospective jurors and prospective jurors who wanted proof of Defendant's guilt was improper. The trial court erred in denying the motion for mistrial regarding prospective juror Buckner. Defense counsel was ineffective during jury selection. The State misstated the law during jury selection; thus, misleading the jury.

4. Defendant asserts a *Batson* challenge. The transcript is incomplete. The trial court erred in denying Defendant's peremptory challenges. Defense counsel was ineffective.

5.  Defendant was not timely arraigned and trial was not timely conducted.

6.  At the time of the arrest, police officers had no arrest warrant and no indictment papers to show why Defendant was being held.

All claims regarding ineffective assistance of counsel should be relegated to post-conviction relief.  Of the remaining claims, several were not properly raised by Defendant and, thus, have not been considered. The remaining assignments raised by Defendant lack merit.

## FACTS:

Defendant was convicted of second degree murder for killing Robert Rumback in May of 2005.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record.  After reviewing the record, we find that there are no errors patent.

## ASSIGNMENT OF ERROR:

Defendant contends the evidence presented at trial was not sufficient to convict him of the murder of Robert Rumback.  Defendant argues that the State did not prove, either through direct or circumstantial evidence, that he delivered a fatal blow. Further, even if the fight between Robert and Defendant resulted in a fatal blow, Defendant contends the State did not prove that he had the specific intent to kill. Moreover, Defendant claims he acted in self-defense when he struggled with Robert.

Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm.  La.R.S. 14:30.1(A)(1).

In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine

2

whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; *see State v. Neal*, 2000-0674[,] p. 9 (La.6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory test of La. R.S. 15:438 "works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Neal*, 2000-0674[,] p. 9, 796 So.2d at 657.

*State v. Leger*, 05-11, p. 91 (La.7/10/06), 936 So.2d 108, 170.

Louisiana courts have held that a showing that a Defendant inflicted multiple cut, slash, or stab wounds on a victim is sufficient to support a finding that the Defendant intended to commit second degree murder. *State v. Pagan*, 04-1478 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, *writ denied*, 05-2003 (La.2/17/06), 924 So.2d 1013; *State v. Mackens*, 35,350 (La.App. 2 Cir. 12/28/01), 803 So.2d 454, *writ denied*, 02-413 (La.1/24/03), 836 So.2d 37; *State v. Bates*, 95-1513 (La.App. 1 Cir. 11/8/96), 683 So.2d 1370; *State v. Segura*, 464 So.2d 1116 (La.App. 3 Cir.), *writ denied*, 468 So.2d 1203 (La.1985). Additionally, when a Defendant flees or attempts to avoid apprehension, the trier of fact may infer a guilty conscience. *State v. Cazenave*, 00-183, 00-184 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, *writ denied*, 00-3297 (La.10/26/01), 799 So.2d 1151 (*citing State v. Fuller*, 418 So.2d 591, 593 (La.1982)).

*State v. Richards*, 06-1553, pp. 14-15 (La.App. 3 Cir. 5/2/07), 956 So.2d 160, 169-70.

Homicide is justifiable in some instances: in cases of self defense; if necessary to prevent a violent or forcible felony involving danger to life or great bodily harm; in situations where the offender reasonably believes the victim is likely to use unlawful force against a person present in a dwelling, business, or motor vehicle; and when the offender is lawfully inside a dwelling, business, or motor vehicle and the offender reasonably believes that deadly force is necessary to either repel an intruder or force the intruder to leave the premises. La.R.S. 14:20. "When a Defendant claims self-defense in a homicide case, the State bears the burden of establishing beyond a reasonable doubt that the

3

Defendant did not act in self-defense." *State v. Loston*, 03-977, p. 9 (La.App. 1 Cir. 2/23/04), 874 So.2d 197, 204, *writ denied*, 04-792 (La.9/24/04), 882 So.2d 1167.

In examining a claim of self-defense, it is necessary to consider: (1) whether the Defendant had a reasonable belief that he was in immediate danger of death or great bodily harm; (2) whether, under circumstances such as the possibility of escape, killing was necessary to prevent that death or great bodily harm; and (3) whether the Defendant was the aggressor in the conflict. *State v. Jenkins*, 98-1603 (La.App. 4 Cir. 12/29/99), 750 So.2d 366, *writ denied*, 00-556 (La.11/13/00), 773 So.2d 157.

*Id*. at 170-71.

Paul Rumback, along with police, discovered his brother Robert's body in the closet of Robert's home on May 26, 2005. Robert had been wrapped in a blanket, which had been duct taped and bound securely with an extension cord.

On the same date, Dr. Joel Carney, who was accepted as an expert in the field of pathology with a subspecialty in forensic pathology, performed an autopsy on Robert. Dr. Carney testified that Robert received nine lacerations to the scalp. He was not able to determine if any of the nine blows caused trauma to the brain because the brain showed moderately advanced decompositional changes. However, in his autopsy report, Dr. Carney stated that all of the scalp wounds collectively could be considered a fatal injury due to bleeding.

Dr. Carney testified that Robert was also stabbed in the midline at the back of the neck, in the right upper back, and the right flank. The stab wounds to the back and right flank did not penetrate any body cavity and did not produce any damage to the internal organs; thus, they were considered superficial stab wounds and were not considered life threatening.[1] The stab wound to the back of the neck passed through

---

[1]The wound to the back was a depth of approximately one inch and the wound to the flank was approximately one and a half inches in depth.

4

the atlanto-occipital membrane into the cranial vault. The brain had liquified; therefore, Dr. Carney was not able to document damage to the brain. Dr. Carney was then asked, "If it did enter the brain would that have been a fatal wound." Dr. Carney answered affirmatively. Dr. Carney testified that the area at issue was known as the medulla oblongata, which controls respiration and heart rate, and any injury to that area, even a minute injury, was essentially fatal. Dr. Carney testified that Robert died from a combination of blunt force trauma to include multiple lacerations to the scalp and three stab wounds.

Both Defendant and Adeline Fruge were present when Robert was killed, and both testified at trial.[2] Fruge indicated Defendant hit Robert several times and Defendant testified that he hit Robert several times during an altercation, but Fruge stabbed Robert. Their version of the events that occurred in May of 2005 follows.

Fruge testified that she accompanied Defendant to Robert's home on a Sunday in May of 2005. While in Robert's bedroom, Defendant asked Robert for twenty dollars he owed him, and Robert indicated he did not have the money because he had not gotten paid. Robert then answered a knock at his door and told the person to come back later because he had company. Robert reentered the bedroom and sat on the bed. Defendant then asked Robert, "did you freak my baby last night." Robert did not answer, and Fruge told Defendant it was none of his business. Fruge testified that she eventually told Defendant she and Robert did not have sexual intercourse, but that Robert performed oral sex on her. Fruge testified Defendant became furious. Defendant then stated to Robert that he had been told three times that if he ever

_____

[2]Fruge testified she had previously dated Defendant for three to four years, but the two had not been together for approximately eleven months prior to the offense at issue. The two separated because she had been incarcerated for simple burglary.

5

touched Fruge, Defendant would kill him. Defendant told Robert, "today is the day you are going to die." Robert put his head down, and Defendant got a rock out of a bag he had brought with him and hit Robert in the middle of the head with it. Robert fell to his hands and knees. Defendant then hit Robert with the rock "a lot" and then retrieved something else from his bag. Robert was on his back at this point and Defendant turned him over and hit him with the object on both sides, the legs, and the back of the neck. Fruge testified that she asked Defendant to stop, but he told her she was going to die next and then he was going to kill himself. Fruge further testified that, at some point, Defendant threw her a blanket and told her to cover her head, because he felt she would not want to see a specific blow he intended to inflict. Fruge testified that she covered her head, but peeked and saw Defendant hit Robert in the back of the head with an object. When Fruge came out from under the blanket, she saw that Robert was covered with blood and was not moving. At that time, Defendant asked her to find a rope, and Defendant wrapped Robert up in a blanket using duct tape and an extension cord. Defendant then put Robert in a closet.

Defendant mopped up the blood on the floor two to three times. Defendant then changed his clothes, putting on clothes and tennis shoes that belonged to Robert. Defendant put his clothes in a garbage bag. Fruge testified Defendant also took money, two or three dollars, from Robert's wallet.[3] However, Fruge did not mention this to police. Fruge and Defendant subsequently left Robert's house. Defendant then put his clothes in a dumpster behind a furniture store. At the dumpster, Defendant decided to go back to Robert's home. Fruge testified she stayed by the dumpster, and Defendant had someone watch her until he returned.

---

[3]Lieutenant Donald Thompson testified that Robert's wallet was found at the foot of his bed, and there was no money in it.

6

Fruge spoke to attorney Ed Lopez about this matter on June 1, 2005.[4] Lopez then phoned the police and Fruge gave a statement at that time. Fruge did not recall Lopez reaching an agreement that she would not be charged in this matter.[5]

Fruge testified she did not initially report the incident to police because she was scared of Defendant. However, Fruge lived with Defendant after he was initially arrested and released. At the time of trial, Fruge testified she had not used drugs in two weeks.

Defendant testified that, on the day Robert died, he met Fruge on his way to Robert's house to collect money he was owed, and she accompanied him there. Robert invited them in and the group went into the bedroom. Some time later, a man and woman came to Robert's door, but he did not let them in. Robert returned to the room, and he and Fruge smoked crack while Defendant ate pudding. Another person came to Robert's door. Robert argued with the person but did not let that person inside the residence.

Once Robert returned to the room, he and Fruge began acting funny. Defendant questioned Robert and Fruge, and Fruge eventually told him she and Robert did the "freaky dicky." Defendant testified that he started crying. Fruge then informed Defendant that she and Robert merely had oral sex for five minutes. Robert said Fruge was lying. Defendant testified that Fruge then "went off," and Robert

---

[4]Lieutenant Thompson interviewed Defendant on May 31, 2005. At that time, he told Defendant he was going to get a warrant for Fruge's arrest. Defendant was released after the interview. The following day, Lieutenant Thompson received a call from Attorney Ed Lopez stating Fruge wanted to give a statement.

[5]Lieutenant Thompson testified that he spoke to Lopez about Fruge, but never made an agreement that Fruge would not be arrested or charged and he did not talk to anyone at the district attorney's office. Lopez testified that he spoke to Lieutenant Thompson, who said he had spoken to the district attorney's office and they would not charge Fruge or have her arrested.

7

came at him like he was attacking him.  Defendant testified that he pushed Robert backwards onto the bed.  Robert sat down, and Defendant told him, "stay there, I'm telling you, do not attack me."  Later, Robert charged Defendant again, and Defendant pushed Robert back onto the bed, stating, "stop, man."  Fruge then told Robert to tell the truth.  Robert again said Fruge was lying and came at Defendant.  Defendant testified that he hit Robert with his fists and knocked him down.  Robert grabbed a bottle and came at Defendant again.  Defendant testified Robert attempted to hit him in the head with the bottle and he blocked the blow and hit Robert once with his fists.  Defendant then picked up a rock from the bedside table and hit Robert in the head with it once.[6]  Defendant hit Robert on the head with the rock again, and he fell to the floor.  Defendant then put the rock back on the table, telling Robert, "stay down, don't come at me anymore."[7]  Defendant testified that Robert was still conscious at that time.  Defendant looked at him and said, "man, what's wrong with you . . . . why don't you stop . . . . don't make me hurt you."  Robert grabbed the bottle again and came at Defendant.  Defendant took the bottle from Robert and hit him in the face once or twice.  Robert fell, and Defendant threw the bottle down and told Robert, "this time stay down.  I'm telling you, if you get up this time I will hurt you.  I said, do not make me hurt you."  Defendant testified that Robert had three cuts and had hit his head on the bedside table.

Defendant testified that he knew Robert was hurt, and he did not want to go back to jail, as he had previously been incarcerated for simple battery.  He saw a knife

---

[6]Defendant testified he found the rock at the bottom of the steps when he arrived at Robert's house.  The rock was approximately the size of a golf ball and shaped almost like a diamond.

[7]Defendant testified that he hit Robert with the rock no more than three times.

in the room and picked it up because he had decided to take his own life. Defendant then told Fruge he would make her watch him kill himself. Defendant testified that Fruge took the knife from him, went to Robert, spoke with Robert, and Defendant then saw Robert's legs jump. Fruge subsequently turned around and had blood on her hands and shirt and cried "help me." Defendant testified that he sent Fruge to get two bags. He then saw the knife, which was at least seven inches long, in the back of Robert's head, about the middle of the neck.[8] Fruge pulled the knife from Robert's body, and Defendant checked Robert, who was dead, for vital signs. Fruge then took the blanket off the bed, and he helped her wrap Robert in it. Fruge dragged Robert toward the closet. She then got some duct tape, and he helped her tape the blanket around Robert's head so that blood would not drip on the floor. Defendant and Fruge then cleaned up blood that was in the room. Defendant testified that the door to the closet was not closed when he and Fruge left, and the electric cord was not wrapped around Robert at that time. Defendant later went back to Robert's house to get syrup out of the refrigerator because he remembered he touched the syrup bottle when he got pudding out of Robert's refrigerator.

Defendant admitted he told police, in a statement he gave on May 26, 2005, that Robert was alive when he left the house. In a statement given on June 1, 2005, Defendant stated that Fruge picked up the knife from somewhere in the room and stabbed Robert twice at the base of the skull. Defendant also stated he wore gray gloves when he got the knife from Fruge after she pulled it from Robert's body and white gloves when he put Robert in the closet. He left the gloves in the house.

_____

[8]Defendant testified that he saw two stab wounds, one where the knife went in all the way and a second where the knife must have went in and hit bone.

9

Paul Rumback testified that on Wednesday, May 25, 2005, he saw Defendant walking down the steps of Robert's home with a fold-up shovel in his hand.

_____Albertha Young testified that she saw Defendant and Robert on Saturday night. That night, Fruge dropped Defendant off at Young's house to take a bath, and Fruge later dropped her and Defendant off "on the Hill." Young also saw Defendant on Sunday, some time between 1:00 and 3:00 p.m. At that time, Defendant wanted to see Fruge. Young testified she told Defendant Fruge was at Robert's house. Defendant then said, "Rob, that white boy that used to work offshore." "I told that M _ _ _ er F_ _ _ er not to be around her no more." Young testified she could see Defendant was angry. Later that same day, Young went to Robert's apartment with Reed (Pojo) Roy looking for Fruge, but no one answered the door.

Young gave a statement to police on May 27, 2005, which read as follows:

> On Saturday, May 21, 2005, I Albertha Young went to Robert Rumback's apt. to getting Ataline [sic] for someone. I did see Robert at that time, and he was alive and healthy.
>
> The Sunday afternoon Reid Roy from around Krotz Springs picked me up to look for Ataline [sic], we went to Robert Rumback's apt. I knocked and no one answer the door. I noticed that the locked that was on the door wasn't locked. I didn't want to go in the apt. without no one answering so I left.
>
> Early Sunday evening about 2:pm Kerney [sic] Alsandor came over to my home asking for Ataline [sic]. He had a pt. Heaven Hill, a 24% can of beer and money in his pockets. I told him to check on the North End a Robert Rumback's apt. He then got mad and said he was going over there.

Young testified that her memory was probably better at trial than when she made the statement to police.[9] She later clarified that Defendant stopped at her house looking for Fruge before Roy arrived at her home.

_____

[9]Young admitted she had been charged with possession of crack cocaine and in 2005 she traded sexual favors for drugs.

10

Defendant argues the State failed to prove he had the specific intent to kill Robert. Defendant then points out that Fruge, in her testimony, stated that Defendant attacked Robert and beat him severely, but she did not mention any knives or stab wounds. Defendant contends that his version of the events supports the findings of the coroner, that there were multiple contusions and blunt force trauma, but the fatal blow was caused by a knife to the base of the skull. Defendant contends Fruge caused the fatal injury.

Defendant further argues that to give credence to Fruge's version of events, one must take the word of a crack-addicted prostitute who ran to a criminal defense attorney rather than police to give the true version of events. Defendant contends that Fruge's story does not fit with the autopsy findings and her credibility is frail. Yet, on the basis of Fruge's testimony, Defendant was convicted of murder.

The testimony of both Fruge and Defendant put them in Robert's home on the date of his death. They both testified that Defendant hit Robert several times with a rock, and Defendant testified that he hit Robert with his fists and a bottle. The testimony of Defendant and Fruge differs as to who actually stabbed Robert.

Fruge testified that Defendant hit Robert in the back of the neck with an object, which she could not make out. Fruge's testimony further indicates that she did not inflict any injuries upon Robert. Based on Fruge's testimony, we find that Defendant caused Robert's death, as Defendant inflicted nine scalp lacerations and three stab wounds upon Robert. The number of wounds inflicted by Defendant is indicative of his specific intent to kill. Additionally, Fruge testified Defendant told Robert, "today is the day you are going to die." Based on this evidence, we find that the State proved, beyond a reasonable doubt, that Defendant committed second degree murder.

11

If the jury chose to believe Fruge's version of the events, its verdict was based on a credibility determination and that determination should not be second guessed by this court. *State v. Roberson*, 06-1568, p. 7 (La.App. 3 Cir. 5/2/07), 956 So.2d 736, 740.

Moreover, if the jury chose to believe Defendant's testimony, he is still guilty of second degree murder. Defendant testified that he hit Robert with his fists, a rock, and a bottle and that Fruge stabbed Robert. Dr. Carney testified that Robert received nine lacerations to the scalp, and collectively those wounds could be considered a fatal injury due to bleeding. Based on this testimony, the jury could have found Defendant caused Robert's death. The supreme court has held that "'[i]t is not essential that the act of Defendant should have been the sole cause of the death; if it hastened the termination of life, or contributed, mediately or immediately, to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient.' *State v. Wilson*, 114 La. 398, 38 So. 397 (1905) (death from pneumonia caused by gunshot wound); *State v. Matthews*, 38 La.Ann. 795 (1886); *State v. Scott*, 12 La.Ann. 274 (1857)." *State v. Matthews*, 450 So.2d 644 (La.1984). The jury could have also found Defendant had the specific intent to inflict great bodily harm when he struck Robert numerous times knocking him onto the bed and the floor. In *State v. Runyon*, 05-36, p. 13 (La.App. 3 Cir. 11/2/05), 916 So.2d 407, 418, *writs denied*, 06-1348 (La. 9/1/06), 936 So.2d 207 and 06-667 (La. 11/17/06), 942 So.2d 526, this court found the following:

> Viewing the evidence in the light most favorable to the State, a rational trier of fact could have determined that Defendant Runyon hit Mr. Wiley on the head with a log and the hit satisfied the requirements of La.R.S. 14:31(A)(1), i.e., Defendant Runyon's hitting Mr. Wiley on the head with a log with enough force to knock him to the ground evidenced the specific intent to, at the least, inflict great bodily harm on him.

12

Based on the evidence presented, we find that the State proved, beyond a reasonable doubt, that Defendant committed the second degree murder of Robert Rumback.

SELF-DEFENSE

Defendant contends the State failed to prove beyond a reasonable doubt that he did not kill Robert in self-defense. Defendant asserts that even if one of the blows he inflicted upon Robert was fatal, he was defending himself when the blows were struck. Defendant asserts that Robert attacked him, charging him three times, and hitting him in the head with a bottle. Defendant admits that he hit Robert, but only in an attempt to keep Robert from harming or even killing him. Defendant asserts the State did not prove that hitting Robert in the head with a rock was not necessary to save himself from danger.

If the jury chose to believe Fruge's testimony, Defendant's claim of self-defense lacks merit. Under Fruge's version of the events, Defendant began to hit Robert while Robert was seated on the bed and there was no testimony from Fruge that Robert charged or hit Defendant. Based on this testimony, the State proved beyond a reasonable doubt that Defendant did not act in self-defense. Further, if the jury chose to believe Defendant's testimony, Defendant's claim of self-defense also lacks merit. Defendant's testimony indicates Robert never hit him, although he charged him several times, once while armed with a bottle. Each time Defendant either pushed Robert away or hit him, knocking him down. During the altercation, Defendant told Robert the following:

- •"stay there, I'm telling you, do not attack me"
- •"stay down, don't come at me anymore"

13

• "man, what's wrong with you. . . . why don't you stop. . . . don't make me hurt you"

• "this time stay down.  I'm telling you, if you get up this time I will hurt you.  I said, do not make me hurt you."

These comments made by Defendant do not indicate he had a reasonable belief he was in immediate danger of death or great bodily harm.  Additionally, Defendant never testified that he feared for his safety.  Furthermore, Defendant never attempted to leave Robert's home.  Finally, "a Defendant's concealment of the body is inconsistent with a self-defense argument. *State v. Patorno*, 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141." *Richards*, 956 So.2d at 171.

Based on the evidence presented, we find that the State proved beyond a reasonable doubt that Defendant did not act in self-defense.

*PRO SE* **ASSIGNMENT OF ERROR NO. 1:**

Defendant contends the State knowingly used false testimony to obtain a tainted conviction.  Defendant asserts that a conviction obtained through use of false testimony, known to be such by the State, must fall under the Fourteenth Amendment.  Additionally, the same result occurs when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

Defendant argues that both Lieutenant Thompson and Fruge gave false testimony.  In support of his argument, Defendant discusses testimony regarding an agreement not to prosecute Fruge in this matter.  Lopez testified that he spoke to Lieutenant Thompson, who said he had spoken to the district attorney's office and they would not charge Fruge or have her arrested.  Lieutenant Thompson testified that he spoke to Lopez about Fruge, but never made an agreement that Fruge would not be arrested or charged, and he did not speak to anyone at the district attorney's office

14

about the matter. Fruge did not recall Lopez reaching an agreement that she would not be charged in this matter.

Defendant failed to object to the alleged testimony as perjury; therefore, he waived his right to assert this error on appeal. La.Code Crim.P. art 841. *See also State v. Singleton*, 05-634, p. 9 (La.App. 5 Cir. 2/14/06), 923 So.2d 803, 810, *writ denied*, 06-1208 (La. 11/17/06), 942 So.2d 532.

Within this assignment of error, Defendant asserts that defense counsel erred by not using video taped statements to impeach the testimony of Fruge and Lieutenant Thompson. Defendant references video taped statements given by himself on May 31, 2005, and video taped statements given by Fruge on May, 26, 2005, June 1, 2005, and June 9, 2005. Defendant does not discuss the contents of these taped statements. Additionally, the only taped statement admitted into evidence was a statement given by Fruge on May 26, 2005.

This as a claim of ineffective assistance of counsel. We find that the record is insufficient to rule on Defendant's claim of ineffective assistance of counsel. Rather than on direct appeal, ineffective assistance of counsel claims are most appropriately addressed through an application for post-conviction relief filed in the trial court where a full evidentiary hearing can be conducted. *State v. Leger*, 05-11, p. 44 (La. 7/10/06), 936 So.2d 108, 142, *cert. denied*, __ U.S. __, 127 S.Ct. 1279 (2007). Accordingly, we find that Defendant's claim of ineffective assistance of counsel should be relegated to post-conviction proceedings.

## *PRO SE* ASSIGNMENT OF ERROR NO. 2:

In his second *pro se* assignment of error, Defendant contends that during jury instruction, the State misstated the law thereby purposely misleading the jury.

During *voir dire*, the following exchange occurred between the State and a prospective juror:

> Q.    The question you didn't hear was have you had any friends that had gone and seen something happened, you weren't present, and they come back to you separately and they tell you different stories. Now they're all trying to tell you the truth but the stories are different. You've had that happen, haven't you? They telling you the truth.
>
> A.    They add something.
>
> Q.    They add or it's something different.
>
> A.    Right.
>
> Q.    That's human nature, right?
>
> A.    Right.

Defense counsel failed to object to the comments complained of by Defendant; therefore, review of this issue on appeal was waived. La.Code Crim.P. art. 841.

Defendant also complains about the following statements made by the State: "But Judge Boagni can't sit in this case. Judge Harris can't sit in this case. It must be a jury of Defendant's peers. You hadn't thought about that, had you. A judge is not competent to judge this kind of case, only a jury." Defense counsel objected on the basis that the State was misleading the jury. The State then responded with the following remarks to the prospective jurors:

> Well, what Mr. Olivier's is objecting to is if Defendant waives the jury, but he has to waive the jury, and it's only if he waives the jury. So until he waives the jury, the Judge cannot decide this case. Our law is prejudice in favor of juries in this kind of case. I don't think I misstated that, did I? But you are the proper parties if you're chosen to serve on this jury to decide this case. And that's important.

Given the remarks above, any misstatement of the law by the State during *voir dire* was corrected after defense counsel's objection. Thus, Defendant failed to prove the jury was misled. Accordingly, this assignment of error lacks merit.

16

## *PRO SE* ASSIGNMENT OF ERROR NO. 3:

In his third *pro se* assignment of error, Defendant contends the State's "use of peremptory strikes against African American prospective jurors and prospective jurors who wanted proof of" his guilt was improper.

PROSPECTIVE JURORS JOHNSON AND TYLER

Defendant complains about the State's challenges to prospective jurors Patrick Johnson and Calvin Tyler. The State moved to strike prospective jurors Johnson and Tyler. Defense counsel subsequently challenged the State's striking of the two prospective jurors, indicating the State had struck the only black males in the jury panel. The State asserted it struck Johnson because he knew Defendant, and the two grew up together in the same neighborhood. The State asserted it struck Tyler because he had a lot of trouble with some of the concepts, particularly self-defense and justification. The trial court then stated it had no problem excusing Johnson because he stated he knew Defendant, grew up in the neighborhood with him, and said they were friends, although they did not socialize or hangout. The trial court then accepted the excuse for Tyler, indicating "he's sort of on the borderline" with regard to understanding.

> [T]he Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. *See also* La.C.Cr.P. art. 795. If Defendant makes a *prima facie* showing of discriminatory strikes, the burden shifts to the state to offer racially-neutral explanations for the challenged members. The neutral explanation must be one which is clear, reasonable, specific, legitimate and related to the particular case at bar. *State v. Collier*, 553 So.2d 815, 820 (La.1989). If the race-neutral explanation is tendered, the trial court must decide, in step three of the *Batson* analysis, whether Defendant has proven purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). A reviewing court owes the district judge's evaluations of discriminatory intent great deference and

17

should not reverse them unless they are clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991); *Batson*, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724.

The *Batson* explanation does not need to be persuasive, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. *Purkett*, 115 S.Ct. at 1771. The Hernandez court explained:

> A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the [party's] explanation, the reason offered will be deemed race neutral.

*Hernandez*, 500 U.S. at 359, 111 S.Ct. at 1866. The ultimate burden of persuasion remains on the party raising the challenge to prove purposeful discrimination. *Purkett*, 514 U.S. at 767-68, 115 S.Ct. at 1771; *Hernandez*, 500 U.S. at 359, 111 S.Ct. at 1866.

*State v. Scott*, 04-1312, pp. 57-58 (La. 1/19/06), 921 So.2d 904, 944, *cert. denied*, __ U.S. __, 127 S.Ct. 137 (2006).

Defendant asserts he had no relationship with Johnson, who is at least twenty years older than him, and Johnson admitted the two never socialized or hung out together. He further asserts the "pattern is set Mr. Johnson is African American [and] he wanted proof Defendant was guilty. He told Mr. Richard he was not going to trick him. This is why he was released." Defendant asserts that Tyler gave the same answers as the rest of the panel, except he mentioned the State would have to prove Defendant was guilty.

Although the trial court never found a *prima facie* case of discrimination, the State articulated race neutral reasons on the record for the two disputed challenges. Further, as mentioned by Defendant during jury selection, the twelve-member jury was comprised of eight whites and four blacks. Therefore, we find that no prejudice

18

is apparent in this case. *See State v. Brown*, 03-897, p. 50 (La. 4/12/05), 907 So.2d 1, 34. Accordingly, Defendant's claim lacks merit.

PROSPECTIVE JUROR FONTENOT

After prospective juror Johnson was excused, prospective juror Fontenot informed the trial court that she knew Defendant's father. The State approached the bench and used a peremptory challenge against Fontenot. Fontenot was subsequently excused by the trial court. Defense counsel moved for a mistrial, stating he felt the jurors that were sworn in were tainted by the release of Fontenot in open court. He further stated that Fontenot said she knew Defendant, and then she was suddenly dismissed. The State indicated Fontenot was dismissed before the jury was sworn in and that no one knew why she said what she had said. The trial court found the jury was not tainted, stating Fontenot said, "'I know Defendant's father.' And that was a question that we asked all of 'em early on." The motion was then denied.

Defendant asserts the trial court erred in denying defense counsel's motion for mistrial. Defendant contends the trial court could not be sure the prospective jurors were not tainted without questioning them about how they felt. Defendant asserts Fontenot's dismissal made her one of the first three prospective jurors dismissed by the State, which were black.

Defendant has pointed to nothing in the record that indicates Fontenot was black. Furthermore, for the reasons set forth below, we find that the trial court did not err in denying Defendant's motion for mistrial.

In *State v. Weary*, 03-3067, p. 36 (La. 4/24/06), 931 So.2d 297, 321, *cert. denied*, __ U.S. __, 127 S.Ct. 682 (2006), the supreme court discussed motions for mistrial as follows:

19

La.C.Cr.P. art. 775 states in part that a Defendant's motion for mistrial shall be ordered "when prejudicial conduct in or outside the courtroom makes it impossible for Defendant to obtain a fair trial." The "prejudicial conduct" may include remarks of veniremen during voir dire. *State v. Carmouche*, 2001-0405 p. 20 (La.5/14/02), 872 So.2d 1020, 1035. However, mistrial is a drastic remedy that is warranted only when Defendant has suffered substantial prejudice such that he cannot receive a fair trial. *Carmouche*, 2001-0405 p. 20, 872 So.2d at 1035; *State v. Wessinger*, 1998-1234 p. 24 (La.5/28/99), 736 So.2d 162, 183, *cert. denied*, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999). "A trial court need not order a new trial [or dismiss a jury panel] absent a showing that comments made by a prospective juror affected other jurors or prejudiced Defendant." *Carmouche*, 2001-0405 p. 20, 872 So.2d at 1035; *State v. Cushenberry*, 407 So.2d 700, 701-702 (La.1981); *State v. Hutto*, 349 So.2d 318, 320 (La.1977). The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge; this decision will not be overturned on appeal absent an abuse of that discretion. *Carmouche*, 2001-0405 p. 20, 872 So.2d at 1035; *Wessinger*, 98-1234 p. 24, 736 So.2d at 183. In deciding the correctness of the trial court's voir dire rulings, a reviewing court considers the entirety of the voir dire record. *Carmouche*, 2001-0405 p. 20, 872 So.2d at 1035; *State v. Hall*, 616 So.2d 664, 669 (La.1993).

Louisiana Code of Criminal Procedure Article 795 provides, in pertinent part, as follows:

B. (1) Peremptory challenges shall be exercised prior to the swearing of the jury panel.

(2) Peremptory challenges of jurors shall be made and communicated to the court in a side bar conference of the judge, the attorneys conducting the examination and selection of jurors, and Defendant in a case in which Defendant chooses to represent himself. The conference shall be conducted in a manner that only the court, the attorneys, and Defendant in a case in which Defendant chooses to represent himself, are aware of the challenges made until the court announces the challenges without reference to any party or attorney in the case.

We find that the State asserted its peremptory challenge in a bench conference before the selected jurors were sworn in, in compliance with art. 795. Furthermore, defense counsel based his motion for mistrial on the basis that Fontenot indicated she knew Defendant when Fontenot actually said she knew Defendant's father.

20

Additionally, other prospective jurors, particularly Johnson and Edwards, said they knew Defendant's family during questioning of the jury panel at issue. We find that there is nothing in the record to indicate Fontenot's comments prejudiced Defendant. Therefore, we cannot say the trial court abused its discretion when denying the motion for mistrial.

PROSPECTIVE JUROR BUCKNER

Defendant next discusses prospective juror Buckner. He asserts Buckner had reservations, but stated she would follow the law. However, she was dismissed for cause because she wanted proof of his guilt.

The State moved to have Buckner dismissed for cause on the basis that she had trouble accepting the concept of proof beyond a reasonable doubt and that she did not believe in life imprisonment without benefit of probation, parole, or suspension of sentence. Defense counsel made argument, and the trial court granted the challenge for cause, stating Buckner had problems saying she could be fair and impartial.

Defense counsel failed to object to the dismissal of Buckner for cause. Therefore, Defendant waived review of this issue on appeal. La.Code Crim.P. art. 841.

INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts he had a conflict with defense counsel because he wanted to strike prospective jurors Lavergne, Tassin, Francois, and Miller, and defense counsel did not want to. Defendant asserts this constituted ineffective assistance of counsel.

The record is insufficient to rule on Defendant's claim of ineffective assistance of counsel. Rather than on direct appeal, ineffective assistance of counsel claims are

21

most appropriately addressed through an application for post-conviction relief filed in the trial court where a full evidentiary hearing can be conducted. *Leger*, 936 So.2d 108. Accordingly, we find that Defendant's claim of ineffective assistance of counsel should be relegated to post-conviction proceedings.

MISSTATEMENT OF THE LAW

Defendant asserts that during jury instructions the State misstated the law, purposely misleading the jury. Defendant asserts the "court erred in Mr. Richards remarks on reasonable doubt and possible doubt which was not objected to." Defendant failed to object to the alleged error; therefore, he has waived his right to assert this error on appeal. La.Code Crim.P. art 841.

***PRO SE* ASSIGNMENT OF ERROR NO. 4:**

In his fourth *pro se* assignment of error, Defendant asserts a *Batson* challenge. Defendant asserts he was forced to object to the way the State was unfairly dismissing black jurors in violation of the *Batson* rule. Defendant asserts the trial court's ruling was omitted from the transcript; therefore, the transcript is incomplete. Defendant also asserts the trial court erred when it denied his peremptory challenges. Additionally, defense counsel was ineffective in that he did and said nothing.

After the prospective alternate jurors were questioned, Defendant informed the trial court of the following: "Right. Um - it's like this, Your Honor, I'm gonna be frank. I would like it to be more equally racial, and right now we're looking at eight (8) white people and four (4) blacks. And I don't like the odds." The trial court then informed Defendant that there were African-Americans on the panel that were excused, but they were excused for legitimate reasons and denied Defendant's objection.

22

*BATSON*

In this assignment of error, Defendant has not set forth the names of prospective jurors that were improperly challenged by the State on the basis of race. Thus, this issue has not been properly briefed by Defendant and should be considered abandoned.

TRANSCRIPT

We note the trial court's denial of Defendant's objection regarding jury composition was in the transcript; therefore, Defendant's claim that the transcript is incomplete is incorrect.

PEREMPTORY CHALLENGES

Defendant contends the trial court erred when denying his peremptory challenges. Defendant does not set forth the names of the prospective jurors he wished to strike, the reasons the trial court's rulings were erroneous, or the number of peremptory challenges he used. Accordingly, Defendant has not sufficiently briefed this issue. Therefore, we find this issue has been abandoned.

INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends defense counsel was ineffective in that he did and said nothing. The record is insufficient to rule on Defendant's claim of ineffective assistance of counsel. Rather than on direct appeal, ineffective assistance of counsel claims are most appropriately addressed through an application for post-conviction relief filed in the trial court where a full evidentiary hearing can be conducted. *Leger*, 936 So.2d 108. Accordingly, Defendant's claim of ineffective assistance of counsel should be relegated to post-conviction proceedings.

*PRO SE* **ASSIGNMENT OF ERROR NO. 5:**

23

In his fifth *pro se* assignment of error, Defendant contends he was not timely arraigned, and his trial was not timely conducted. Defendant alleges he was indicted on November 28, 2005. He further alleges that at his arraignment on February 17, 2006, he orally urged a motion to quash and to be relieved of his bail obligation because more than thirty days had lapsed since he was indicted. Defendant contends the trial court denied his oral motions and instructed defense counsel to put the motions in writing and a hearing on the matter would be held in two weeks. Defendant further contends he was never taken to court and that the motions were not ruled on by the trial court. Defendant contends there is no record of the motions he filed, the trial court's rulings thereon, and defense counsel's objections.

> Defendant's statutory right to a speedy trial is found in La.Code Crim.P. art. 701(D), which provides that the trial of a Defendant charged with a felony shall commence within 120 days if he is continued in custody. "However, this article merely authorized the pre-trial release of Defendant, and upon a Defendant's conviction, the issue is moot." [*State v.*] *McSweeney*, 619 So.2d [861] at 865 [(La.App. 3 Cir. 1993)], citing, *State v. Cowger*, 581 So.2d 283 (La.App. 5 Cir.1991); *State v. Johnston*, 480 So.2d 823 (La.App. 2 Cir.1985).

*State v. Williams*, 96-1181, p. 9 (La.App. 3 Cir. 3/5/97), 692 So.2d 509, 514, *writ denied*, 97-1484 (La. 12/19/97), 706 So.2d 449.

Defendant was convicted, thus, any violation of Defendant's statutory right to a speedy trial is moot. Accordingly, this assignment of error lacks merit.


*PRO SE* **ASSIGNMENT OF ERROR NO. 6:**

In his sixth *pro se* assignment of error, Defendant contends that at the time of his arrest, police officers had no arrest warrant and no indictment papers to show why he was being held. Defendant further contends he was never booked into the St. Landry Parish jail or fingerprinted. Defendant also contends that the State's records

24

did not show his correct arrest date on the computer because he was never booked and still has not been to this date.

Defendant has failed to allege an error and properly brief the issue. Thus, this assignment error will not be considered.

**CONCLUSION:**

Defendant's conviction is affirmed.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.

25